UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORIANA HARRISON, an individual,<br><br>Plaintiff,<br><br>v.<br><br>PORTFOLIO GROUP MANAGEMENT, INC., a Nevada corporation; EXECUTIVE MANAGEMENT SOLUTIONS, INC., d/b/a TAXCITE, a California corporation; DAVID GLENWINKEL, an individual; and KRISTI CROWLEY, an individual,<br><br>Defendants. | No. 2:18-cv-01104-MCE-KJN<br><br>**MEMORANDUM AND ORDER** |

Through this action, Plaintiff Oriana Harrison ("Plaintiff") seeks redress from Defendants Portfolio Group Management, Inc. ("PGM"), Executive Management Solutions, Inc. ("EMS"), David Glenwinkel ("Glenwinkel"), and Kristi Crowley ("Crowley") (collectively, "Defendants"), based on the following claims for relief: (1) Negligence; (2) Breach of Fiduciary Duty; (3) Breach of Contract; (4) Violations of California Financial Code §§ 51000 et seq.; and (5) Conversion. Compl., ECF No. 1 ("Compl."). Presently before the Court is Plaintiff's Motion for Partial Summary Judgment, which seeks adjudication on the issue of personal liability as to Glenwinkel and Crowley and of the Fourth Claim for Relief for violations of California Financial Code §§ 51000 et seq. ECF

No. 22 ("Pl.'s Mot."). This matter has been fully briefed. Defs.' Mem. Opp. Pl.'s Mot., ECF No. 29 ("Defs.' Opp."); Pl.'s Reply Defs.' Opp., ECF No. 30 ("Pl.'s Reply"). For the reasons set forth below, Plaintiff's Motion is GRANTED.[1]

# BACKGROUND[2]

PGM first incorporated in Nevada on April 14, 2003, under the name EMS. Ex. 8, Lurie Decl., ECF No. 22, at 218 ("Lurie Decl."). The bylaws were titled "By-Laws of Executive Management Solutions, Inc. (Amended September 17, 2004) as Portfolio Group Management, Inc." Ex. 22, Lurie Decl., at 273. On July 14, 2005, PGM registered as a foreign corporation in California. Ex. 7, Lurie Decl., at 215. A few years later, in January 2010, EMS incorporated in California as a separate entity. Ex. 24, Lurie Decl., at 280. On May 3, 2017, PGM filed a certificate of dissolution with the Nevada Secretary of State.[3] Ex. 8, Lurie Decl., at 221. During the relevant time period, Glenwinkel was the President and Secretary of PGM and the Chief Executive Officer of EMS, plus he owned 100 percent of the stock in both corporations. Crowley was the Chief Financial Officer ("CFO") and Treasurer of PGM and the CFO and Secretary of EMS.

Plaintiff formerly owned a residence on Hubert Road in Oakland, California ("Hubert Property") and has since relocated to England.[4] Defendants held themselves out as an "exchange facilitator" or a "qualified exchange intermediary" to assist Plaintiff

---

[1] Because oral argument would not be of material assistance, the Court ordered this matter submitted on the briefs. E.D. Local Rule 230(g).

[2] Unless otherwise noted, the following recitation of undisputed facts is taken, sometimes verbatim, from Plaintiff's Complaint (ECF No. 1) and the parties' statements of undisputed facts (ECF Nos. 22, 29-2). The page numbers used in this Memorandum and Order refer to the pagination assigned by the Court's ECF system and not to the pagination assigned by the parties.

[3] After Plaintiff filed this suit on May 2, 2018, PGM filed for conversion to a California corporation on June 14, 2018. See Ex. 2, Lurie Decl., at 189–90.

[4] Plaintiff also previously owned property in Los Angeles, California, and entered into a written agreement with PGM for the like-kind exchange of that property on July 15, 2017. Pl.'s Mot. at 11.

2

with tax-deferral benefits for a like-kind exchange of residential real estate. See 26 U.S.C. § 1031; 26 C.F.R. § 1.1031(k)-1. On October 10, 2017, Crowley sent Plaintiff an agreement to perform a like-kind exchange of the Hubert Property. See Ex. 1, Lurie Decl., at 154–61. After the sale of the Hubert Property, PGM held the funds as the qualified exchange intermediary. Defendants represented that, once Plaintiff sold the Hubert Property, they would assist her in safeguarding her funds from the sale and then transfer the funds for Plaintiff's use on a like-kind replacement property. Plaintiff agreed to pay Defendants at least 3 percent of the funds.

In March 2018, third parties hacked into Defendants' email accounts and/or computers, or otherwise gained access to Defendants' emails, allowing them to intercept, read, and delete emails between Plaintiff and Defendants. On March 8, 2018, the third parties deleted Plaintiff's email address and emailed Defendants from an email address which closely resembled Plaintiff's, asking them to transfer the funds from the sale of the Hubert Property to a bank account in Bulgaria. The following day, Glenwinkel authorized and Crowley initiated the wire transfer of the funds minus Defendants' fees to the Bulgarian account on behalf of PGM and EMS. However, Plaintiff does not have a bank account in Bulgaria and never indicated to Defendants that she had such an account. Furthermore, Defendants never asked Plaintiff to verify or confirm the transfer to Bulgaria or provide any information necessary to complete the transfer.

That same day, a representative from the Wells Fargo Financial Crimes Division called Crowley to convey the importance of verbally verifying a wire transfer. Crowley told the representative that she understood the importance and authorized the release of the funds to the Bulgarian account. A couple days later, on March 13, 2018, Crowley received another email from the fraudulent email address, stating that the funds were frozen and Crowley needed to confirm the transfer with Wells Fargo. Crowley subsequently emailed a Wells Fargo representative to release the funds, but the representative told Crowley that it was the depositor's bank who placed a hold on the funds. However, Crowley received another email from the fraudulent email address

saying that Wells Fargo needed to send a confirmation to the Bulgarian bank to release the funds and Crowley again emailed the Wells Fargo representative asking to release the funds immediately.

On March 16 and 18, 2018, the Federal Bureau of Investigation ("FBI") contacted Crowley to discuss the transfer and release of funds to the Bulgarian bank. The FBI warned Crowley of the potentially suspicious nature of the wire transfer and requested that she either freeze the transfer or confirm the transfer's validity. Crowley confirmed the validity of the transfer and provided all documents pertaining to the transfer to the FBI. Crowley eventually realized the wire transfer was fraudulent and asked the FBI to contact the Bulgarian authorities to stop the transfer of funds. On March 26, 2018, the Wells Fargo Financial Crimes Supervisor informed Defendants that Wells Fargo could not recover the transferred funds and advised Defendants to consult with the FBI and Bulgarian authorities. To date, all attempts to recover Plaintiff's funds from the sale of the Hubert Property have been unsuccessful.

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378–79 (C.D. Cal. 1995). The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for

4

summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288–89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251–52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).  The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.  In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original).

As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. at 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**[5]

### A. Personal Liability of Glenwinkel and Crowley

Plaintiff seeks summary adjudication on the issue of imposing personal liability on Glenwinkel and Crowley. Pl.'s Mot. at 2. In doing so, Plaintiff asserts three separate theories: (1) PGM had dissolved prior to its business relationship with Plaintiff and thus, Glenwinkel and Crowley are personally liable as sole proprietors; (2) as officers and directors of PGM and EMS, Glenwinkel and Crowley are personally liable for tortious conduct; and (3) the corporate veils of PGM and EMS should be pierced given the unity of interest and ownership between Defendants. Pl.'s Reply at 1–2; see PMC, Inc. v. Kadisha, 78 Cal. App. 4th 1368, 1380 (2000) (distinguishing personal liability stemming from a director or officer's own tortious conduct versus piercing the corporate veil). For

///

---

[5] As an initial matter, the Court notes that Defendants' Opposition to Plaintiff's 17-page Memorandum in support of its Motion was roughly six pages and barely addressed Plaintiff's arguments. Compare Pl.'s Mot. at 10–26, with Defs.' Opp. at 1–6.

6

the reasons set forth below, the Court finds personal liability attaches to Glenwinkel and Crowley on two grounds.

> **1. Because PGM was dissolved prior to its business relationship with Plaintiff, Glenwinkel is personally liable as a sole proprietor.**

The effects and expiration of a corporation's dissolution "depends upon the law of its domicile" state. Macmillan Petrol. Corp. v. Griffin, 99 Cal. App. 2d 523, 528 (1950). Nevada law dictates that a corporation's dissolution becomes effective "at the time of the filing of the certificate of dissolution with the Secretary of State." Nev. Rev. Stat. Ann. § 78.580(5). The dissolved corporation survives for three years after the date of dissolution for winding up, "but not for the purpose of continuing the business for which it was established." Id. § 78.585(1); see Greb v. Diamond Int'l Corp., 56 Cal. 4th 243, 272 (2013) ("California's survival statute, [California Corporation Code §] 2010, does not apply to foreign corporations . . . ."). After the three-year grace period, the dissolved corporation ceases to exist for any purpose. Macmillan Petrol. Corp., 99 Cal. App. 2d at 528.

Here, PGM filed its certificate of dissolution with the Nevada Secretary of State on May 3, 2017 and thus, its dissolution took effect on that day. See Ex. 8, Lurie Decl., at 221. PGM entered into its first contractual relationship with Plaintiff on July 15, 2017, which means PGM continued its business operations while dissolved. Ex. 43, Harrison Decl., ECF No. 22, at 345 ("Harrison Decl."); see Nev. Rev. Stat. Ann. § 78.585(1) (stating that a dissolved corporation may not continue "the business for which it was established" after the date of dissolution). As a result, Glenwinkel and Crowley's liability for any acts purportedly made on PGM's behalf depends on California law surrounding sole proprietorships.

"A sole owner is a sole proprietorship and a sole proprietorship is not a legal entity separate from its individual owner." Ball v. Steadfast-BLK, 196 Cal. App. 4th 694, 701 (2011); see Pinkerton's Inc. v. Super. Ct., 49 Cal. App. 4th 1342, 1348 (1996) ("Use of a fictitious business name does not create a separate legal entity . . . distinct from the

person operating the business.") (internal citation and quotation marks omitted). "An individual who owns the assets of a sole proprietorship is personally liable for all debts and responsibilities incurred by the business." Century Surety Co. v. Polisso, 139 Cal. App. 4th 922, 943 (2006). Here, Glenwinkel is the sole owner of PGM and owns 100 percent of its stock, thus he is personally liable for PGM's actions. See Defs.' Sep. Stmt. Disputed Mat. Facts, ECF No. 29-2, ¶ 20 ("Defs.' Stmt.").

As the name suggests, however, a sole proprietorship "belongs to a single individual" even though it "may have several or even hundreds of employees or agents." 1 Ballantine and Sterling Cal. Corp. Laws § 22 (2020). Although Crowley was the CFO and Treasurer and performed acts on behalf of PGM, she does not own any stock in PGM and there is no additional evidence demonstrating that Crowley owned any assets in PGM. Therefore, Glenwinkel is personally liable under this theory, but not Crowley. As discussed below, however, personal liability is imposed on both Glenwinkel and Crowley under a different theory.

### 2. As directors and officers of PGM and EMS, Glenwinkel and Crowley are personally liable for their own tortious conduct.

Courts may also find a corporate officer or director personally liable for their own tortious conduct. Kadisha, 78 Cal. App. 4th at 1379 (citing Frances T. v. Village Green Owners Ass'n, 42 Cal. 3d 490, 505 (1986)). "This liability does not depend on the same grounds as 'piercing the corporate veil,' . . . but rather on the officer or director's personal participation or specific authorization of the tortious act." Kadisha, 78 Cal. App. 4th at 1380 (citing Frances T., 42 Cal. 3d at 503–04).

> To maintain a tort claim against a director in his or her personal capacity, a plaintiff must first show that the director specifically authorized, directed or participated in the allegedly tortious conduct; or that although they specifically knew or reasonably should have known that some hazardous condition or activity under their control could injure plaintiff, they negligently failed to take or order appropriate action to avoid the harm. The plaintiff must also allege and prove that an ordinarily prudent person, knowing what the director knew at that time, would not have acted similarly under the circumstances.

Frances T., 42 Cal. 3d at 508–09 (internal citations omitted).

The Court finds that Crowley and Glenwinkel are personally liable because Crowley directed and performed the wire transfer after Glenwinkel authorized it, despite repeated warnings from Wells Fargo and the FBI. Plaintiff relies on Michaelis v. Benavides, where the court determined that the director of a corporation was personally liable for the physical damage caused to a client's home given his actions in the events leading to the damage. 61 Cal. App. 4th 681, 686–87 (1998). For example, the director personally bid for the contract, made construction decisions, and negotiated with the general contractor, all of which demonstrated his authorization and direct participation. Id. at 683.

Like the director in Benavides, Crowley and Glenwinkel are officers and directors of PGM and EMS. Defendants claim that Crowley was only an employee acting at the direction of Glenwinkel and cannot incur personal liability, see Defs.' Opp. at 3–4, but Crowley was the undisputed CFO and Treasurer of PGM. More importantly, like the director in Benavides who personally participated in and authorized actions leading to the client's damage, Crowley personally directed the wire transfer to the Bulgarian bank, which Glenwinkel authorized her to perform. Defs.' Stmt., ¶¶ 26–27. The result of this transfer was the loss of Plaintiff's funds which have yet to be recovered. Accordingly, should the ultimate trier of fact find in favor of Plaintiff, Glenwinkel and Crowley are exposed to personal liability because of their direct participation and authorization in the wire transfer and thus, Plaintiff's Motion on the issue of their personal liability is GRANTED.[6]

///
///
///
///

**B. Fourth Claim for Relief: Violations of Multiple Sections of California Financial Code §§ 51000 et seq.**

---

[6] Because Glenwinkel and Crowley are personally liable under the first two theories, the Court need not reach the issue as to whether the corporate veils of PGM and EMS should be pierced.

### 1. Defendants are exchange facilitators as defined in California Financial Code § 51000.

"Exchange facilitator" means a person that does any of the following:

(A) Facilitates, for a fee, . . . an exchange of like-kind property by entering into an agreement with a taxpayer by which the exchange facilitator acquires from the taxpayer the contractual rights to sell the taxpayer's relinquished property located in this state and transfers a replacement property to the taxpayer as a qualified intermediary . . .

(B) Maintains an office in this state for the purpose of soliciting business as an exchange facilitator.

(C) Holds himself, herself, or itself out as an exchange facilitator by advertising any of the services listed in paragraph (A) or soliciting clients in . . . communications directed to the general public in this state for purposes of providing any of those services.

Cal. Fin. Code § 51000(b)(1). A person is disqualified from acting as an exchange facilitator if that person was an agent of the taxpayer "within the 2-year period ending on the date of the transfer of the first of the relinquished properties . . ." 26 C.F.R. § 1.1031(k)–1(k)(2) (defining an agent as the taxpayer's employee, attorney, accountant, investment banker or broker, or real estate agent or broker).

Here, Plaintiff and Defendants entered into two agreements to perform like-kind exchanges of Plaintiff's property in Los Angeles and the Hubert Property in July and October 2017, respectively. Compl. ¶ 22; Pl.'s Mot. at 11. Although Glenwinkel provided tax assistance to Plaintiff, such assistance was not rendered until March 2018, months after the like-kind exchanges were performed. See Ex. 44, Harrison Decl., at 355–59. Furthermore, Defendants held themselves out to Plaintiff as an exchange facilitator and qualified intermediary with offices in Auburn, California for that purpose. See Defs.' Stmt., ¶¶ 119–20, 122, 136–37, 142. Accordingly, Defendants are exchange facilitators under § 51000 and subject to various statutory requirements, which the Court now addresses.

### 2. Defendants violated California Financial Code §§ 51003 and 51007 for failing to maintain any bond, insurance policy,

**deposit, or letter of credit.**

An exchange facilitator is required to perform at least one of the following:

> (1) Maintain a fidelity bond or bonds in an amount not less than one million dollars ($1,000,000), executed by an insurer authorized to do business in this state or an eligible surplus line insurer pursuant to Section 1765.1 of the Insurance Code.
>
> (2) Deposit an amount of cash or securities or irrevocable letters of credit in an amount not less than one million dollars ($1,000,000) in an interest-bearing deposit account or a money market account with the financial institution of the person's choice. Interest on that amount shall accrue to the exchange facilitator.
>
> (3) Deposit all exchange funds in a qualified escrow account or qualified trust, as those terms are defined under Treasury Regulation 1.1031(k)–1(g)(3), with a financial institution and provide that any withdrawals from that escrow account or trust require that person's and the client's written authorization.

Cal. Fin. Code § 51003(a). Furthermore, an exchange facilitator is required to either:

> (1) Maintain a policy of errors and omissions insurance in an amount not less than two hundred fifty thousand dollars ($250,000), executed by an insurer authorized to do business in this state or an eligible surplus line insurer pursuant to Section 1765.1 of the Insurance Code.
>
> (2) Deposit an amount of cash or securities or irrevocable letters of credit in an amount not less than two hundred fifty thousand dollars ($250,000) in an interest-bearing deposit account or a money market account with the financial institution of the person's choice. Interest on that amount shall accrue to the exchange facilitator.

Id. § 51007(a).

Here, Defendants undisputedly failed to maintain any required bond, insurance policy, deposit, or letter of credit, and admitted they were unaware of these statutory requirements. Defs.' Stmt., ¶¶ 143–44. Furthermore, Defendants held the funds from the Hubert Property sale in PGM's debit account instead of a qualified escrow account or qualified trust. Id. ¶¶ 146–47. Accordingly, Defendants violated §§ 51003 and 51007.

///

### 3. Defendants violated California Financial Code § 51009 because they knowingly commingled exchange funds.

An exchange facilitator must act in accordance with the prudent investor standard and will be in violation of that standard if "[e]xchange funds are knowingly commingled by the exchange facilitator with the operating accounts of the exchange facilitator." Cal. Fin. Code § 51009(a)(1). As previously stated, Defendants admitted they held the funds from the Hubert Property sale in PGM's debit account. Defs.' Stmt., ¶¶ 146–47. Moreover, Glenwinkel's personal funds were also located in the PGM debit account. See id. ¶ 150 (noting that the PGM account contained $683,846 of Glenwinkel's personal funds in March 2018). Consequently, Defendants knowingly commingled exchange funds in violation of § 51009.

### 4. Defendants violated California Financial Code § 51011 because they materially failed to fulfill their contractual duties to Plaintiff.

Exchange facilitators are prohibited from performing any of the following acts:

> (a) Make any material misrepresentations concerning any like-kind exchange transaction that are intended to mislead.
>
> (b) Pursue a continued or flagrant course of misrepresentation, or make false statements through advertising or otherwise.
>
> (c) Fail, within a reasonable time, to account for any moneys or property belonging to others that may be in the possession of, or under control of, the person.
>
> . . .
>
> (f) Materially fail to fulfill its contractual duties to a client to deliver property or funds to the client, unless that failure is due to circumstances beyond the control of the person engaging in business as an exchange facilitator.

Cal. Fin. Code § 51011.

Like-kind exchanges require the location of both properties to be in the United States. See 26 U.S.C. § 1031(h) ("Real property located in the United States and real property located outside the United States are not property of a like kind."). Defendants dispute that they knew Plaintiff intended to purchase a replacement property outside the United States, which would have been inconsistent with their agreement to perform a like-kind exchange. Glenwinkel Decl., ECF No. 29-3, ¶¶ 4, 6 (claiming that Plaintiff

"requested [Glenwinkel] send monies into her personal bank account in London, England," which, "of course, would not be pursuant to a 1031-exchange because the second property was . . . not a property located in the United States."). However, Defendants knew that Plaintiff resided in England and had already transferred funds from another property to her bank account in London. See id.; Ex. 3, Harrison Decl., at 2 ("Are you settled in England?"). Additionally, Crowley communicated to the FBI that PGM engages in the business of like-kind exchanges, had assisted Plaintiff with such exchanges in the past, and that the transfer of funds to the Bulgarian bank account was part of their current exchange agreement. See Ex. 1, Lurie Decl., at 178.

Even if a genuine dispute exists as to whether Defendants encouraged Plaintiff to perform a like-kind exchange with the knowledge that she intended to acquire foreign property, Defendants' actions violate § 51011 in another way. Despite repeated warnings from Wells Fargo and the FBI about the suspicious nature of the wire transfer, Defendants nevertheless proceeded to transfer the funds and as a result, Plaintiff's funds were lost and never recovered. See Cal. Fin. Code § 51011(c), (f). Defendants suggest that international wire fraud or email "spoofing" cannot be reasonably anticipated, Defs.' Opp., at 5, but Wells Fargo and the FBI's repeated warnings negate any argument that the fraud was out of Defendants' control. In sum, Defendants violated the above California Financial Code provisions and Plaintiff's Motion is GRANTED as to the Fourth Claim for Relief.

**CONCLUSION**

As set forth above, Plaintiff's Motion for Partial Summary Judgment, ECF No. 22, is GRANTED. Summary adjudication is accordingly granted as requested with respect to Defendant Glenwinkel and Crowley's liability under the Fourth Claim for Relief for

///

///

violations of California Financial Code §§ 51000 et seq.  The case proceeds on Plaintiff's remaining claims for relief.

IT IS SO ORDERED.

Dated:  June 21, 2021

_____
MORRISON C. ENGLAND, JR
SENIOR UNITED STATES DISTRICT JUDGE